IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

CHARLEA BOOKER,                          §
                                         §
          Plaintiff,                     §
                                         §
v.                                       §          CIVIL NO. H-09-965
                                         §
MICHAEL J. ASTRUE,                       §
COMMISSIONER OF THE                      §
SOCIAL SECURITY ADMINISTRATION,          §
                                         §
          Defendant.                     §

### MEMORANDUM OPINION

     Pending before the court[1] are Plaintiff's Motion for Summary
Judgment (Docket Entry No. 19) and Defendant's Motion for Summary
Judgment (Docket Entry No. 17).  The court has considered the
motions, all relevant filings, and the applicable law.  For the
reasons set forth below, the court **GRANTS** Defendant's Motion for
Summary Judgment and **DENIES** Plaintiff's Motion for Summary
Judgment.

### I.  Case Background

     Plaintiff Charlea Booker ("Plaintiff") filed this action
pursuant to 42 U.S.C. § 405(g) for judicial review of an
unfavorable decision by the Commissioner of the Social Security
Administration ("Defendant" or "Commissioner") regarding
Plaintiff's claim for disability insurance benefits under Title II
and supplemental security income benefits under Title XVI of the

---

[1]     The parties consented to proceed before the undersigned magistrate
judge for all proceedings, including trial and final judgment, pursuant to 28
U.S.C. § 636(c) and Federal Rule of Civil Procedure 73.  Docket Entry Nos. 10,
13-14.

Social Security Act ("the Act").

## A.   **Procedural History**

Plaintiff filed for disability benefits on October 16, 2007, alleging that her disability began on October 10, 2007.[2]  After Plaintiff's application was denied at the initial[3] and reconsideration levels,[4] she requested a hearing before an Administrative Law Judge of the Social Security Administration ("ALJ").[5]  The ALJ granted Plaintiff's request and conducted a hearing in Houston, Texas, on August 8, 2008.[6]  After listening to testimony presented at the hearing and reviewing the medical record, the ALJ issued an unfavorable decision on September 24, 2008.[7]

On February 6, 2009, the Appeals Council ("AC") denied Plaintiff's request for review, thereby making the ALJ's decision the final decision of the Defendant.[8]  Having exhausted her administrative remedies,[9] Plaintiff filed this timely civil action pursuant to 42 U.S.C. § 405(g) for judicial review of the

---

[2]     Transcript of the Administrative Proceedings ("Tr.") 80, 83.

[3]     Tr. 42.

[4]     Tr. 54.

[5]     Tr. 60.

[6]     Tr. 16, 60, 64.

[7]     Tr. 13, 16, 22.

[8]     Tr. 1.

[9]     See Harper v. Bowen, 813 F.2d 737, 739 (5th Cir. 1987), for a summary of the administrative steps a disability claimant must take in order to exhaust her administrative remedies.

Defendant's unfavorable decision.

B.  **Factual History**

   1.   **Plaintiff's Age, Education, and Work Experience**

Plaintiff was born on October 14, 1969, and was thirty-eight years old at the time of the hearing before the ALJ.[10]  She has a twelfth grade education and is certified as a nurse's assistant.[11] Prior to the onset of her alleged disability, Plaintiff worked as a fire watcher for an indeterminate amount of time until September 2007, although prior to that she had worked as a certified nurse's assistant "for a long time."[12]

   2.   **Plaintiff's Testimony**

At the hearing on August 8, 2008, Plaintiff testified that she had her first seizure in August 2007 and that she had not worked outside of the home since then.[13]  She was approximately 5'4" tall and weighed between 250 and 260 pounds.[14]  She lived in a house with her fourteen-year-old son and her twenty-year-old daughter.[15]  She has survived financially by relying on her daughter's income from work and some help from her aunt.[16]  She had been receiving assistance from the Temporary Assistance for Needy Families program

---

[10]   Tr. 18, 27.

[11]   Tr. 18, 28.

[12]   Tr. 18, 28.

[13]   Tr. 28.

[14]   Tr. 33.

[15]   Tr. 29.

[16]   Tr. 29.

(also known as TANF) but was no longer receiving such aid.[17]   She had also been receiving food stamps, though not any longer.[18] Medicare dropped her from coverage for an unclear reason relating to work.[19]

Plaintiff kept busy during the day with her son.[20]   She did everything with him, including talking and playing around the house.[21]   She sometimes went outside to walk "or whatever."[22]   She and both her children would all go to the store to shop for groceries.[23]   Plaintiff's daughter kept the car keys hidden because she did not want Plaintiff taking the chance of having a seizure while driving.[24]

Plaintiff's last three seizures were in March and April 2008, the last of which hospitalized her for two days.[25]   Plaintiff testified that she had last visited a hospital on May 28, 2008, at which time her doctors ordered an EEG performed.[26]  Her doctors told her not to work or drive for at least a year, although she was

---

[17]   Tr. 29.

[18]   Tr. 29.

[19]   Tr. 30.

[20]   Tr. 32.

[21]   Tr. 32.

[22]   Tr. 32.

[23]   Tr. 32.

[24]   Tr. 32.

[25]   Tr. 31.

[26]   Tr. 30.

waiting on the EEG diagnosis appointment on September 3, 2008, to find out more about the nature of her condition.[27]  Her doctors had already suggested various causes for her seizures, including: (1) a delayed reaction from when a car hit her at the age of three; (2) blows to her head during physical altercations with her son's father; and (3) stress from worrying about how to care for her family.[28]

Plaintiff testified that she regularly took Dilantin pills both in the morning and at night to prevent and control her seizures.[29]  She also takes Fenatin but no other medication.[30]  Other than her seizure disorder, she had no other physical problems but was suffering from depression.[31]  She emphasized in her testimony that she "would rather be working any day . . . than to be sitting in my house not being able to do anything.  I'd rather . . . go to work anywhere, any day, than sitting at home, gaining weight, more weight," if only her doctors would permit her to work.[32]

### 3.   Plaintiff's Medical Record

On August 3, 2007, Plaintiff was treated for onset seizure

---

[27]   Tr. 28, 30.

[28]   Tr. 33.

[29]   Tr. 32.

[30]   Tr. 33.

[31]   Tr. 33.

[32]   Tr. 33, 34.

disorder.[33]  A computed tomography ("CT") scan was negative.[34]  She was alert and oriented with clear speech.[35]  She had mild weakness in her upper right extremity but was otherwise at full muscle strength with grossly intact skin senses and deep tendon reflexes.[36]

On August 20, 2007, Plaintiff reported having had two more seizures, the latest one that morning.[37]  She had no muscle pain, numbness, tingling, weakness, depression, or anxiety.[38]  She again had full muscle strength, intact skin senses, and a normal gait.[39]  Her doctor advised her to return in three months.[40]

On October 9, 2007, Plaintiff was involved in a motor vehicle accident while have a seizure.[41]  Doctors took another CT scan of her brain, the results of which were normal.[42]  Plaintiff left the hospital, against medical advice, because she did not want to finish receiving Dilantin intravenously; she was thereafter given the drug

---

[33]    Tr. 146-47.

[34]    Tr. 147, 181.

[35]    Tr. 147.

[36]    Tr. 147.

[37]    Tr. 181.

[38]    Tr. 181.

[39]    Tr. 182.

[40]    Tr. 182-83.

[41]    Tr. 201-02.

[42]    Tr. 194.

to take orally and was noted to have medication "non-compliance."[43] She was notified that failure to raise her Dilantin level intravenously could "result in complications including seizure, death and/or permanent disability."[44]

On October 16, 2007, her Dilantin levels were low so her doctor increased her medication.[45] Her record indicates that she suffered from "simple" obesity at that time.[46]

On October 24, 2007, Shelly Manning, M.D., ("Manning") declared that, due to uncontrolled seizures, Plaintiff was unable to work "at all" and that, although Plaintiff's disability was not permanent, Manning expected it to last for a minimum of six months.[47]

On May 28, 2008, Plaintiff's medical record shows that she reported increased depression and "bizarre behavior."[48]  This was also the appointment where Plaintiff's doctor ordered an EEG to be performed.[49]

On November 10, 2008, after the ALJ hearing but before the AC denied Plaintiff's request for review, Plaintiff drove herself to

---

[43]     Tr. 199, 206, 209.

[44]     Tr. 197.

[45]     Tr. 176.

[46]     Tr. 182.

[47]     Tr. 221-22.

[48]     Tr. 226.

[49]     Tr. 30.

a one-time evaluation by Larry Pollock, Ph.D., ("Pollock").[50]   At
that time, Plaintiff received a General Diagnostic Battery and
Neuropsychological evaluation as part of an application process for
rehabilitation services "leading to an employment outcome," because
she was seeking "help to get a job or to get further training in the
medical field."[51]   Pollock noted that Plaintiff had a depressed mood
but good hygiene and grooming.[52]   She was oriented as to person,
place and time, had logical and goal-directed thought processes, and
had good expressive and receptive language, normal speech, and good
articulation.[53]   She also had fair insight, fair ability to use good
judgment, and good concentration and attention span.[54]   Pollock also
found functional limitations he felt were impediments to employment,
including poor visual naming, motor integration, reproduction,
reproduction memory, and recognition memory, as well as poor
executive functioning.[55]

The evaluation with Pollock is also the only time indicated in
her medical record that Plaintiff ever sought help for her

---

[50]   Tr. 227-28.

[51]   Tr. 227, 233, 237.

[52]   Tr. 228.

[53]   Tr. 228.

[54]   Tr. 228.

[55]   Tr. 232.

depression.[56]  She told Pollock that she had never been prescribed
any medication for depression.[57]

### 4.  Vocational Expert Testimony

After reviewing the file and listening to Plaintiff's
testimony, the vocational expert ("VE"), Carolyne B. Fisher,
testified that Plaintiff had spent most of her life working as a
certified nursing assistant in hospitals and nursing homes, a job
which is medium in exertional demands and semiskilled, according to
the Dictionary of Occupational Titles.[58]  The ALJ asked the VE
whether Plaintiff could return to her past relevant work if she
could not work at heights or elevations, if she could not work
around dangerous equipment, and if she could not work as the sole
caretaker.[59]  The VE replied that Plaintiff could not work as a home
attendant in a one-on-one situation, but that she could perform
adequately in a hospital setting, which would be a positive setting
because help would be readily available should she have a seizure.[60]

The VE also testified that a person such as Plaintiff with
those limitations could perform many other unskilled jobs, such as

---

[56]    See Tr. 228; see also Tr. 105 (where Plaintiff indicated on her
disability report for her application for disability benefits that she had not
been to a doctor/hospital/clinic for emotional or mental problems).

[57]    Tr. 228.

[58]    Tr. 33-34.

[59]    Tr. 35.

[60]    Tr. 35.

an office helper, interoffice mail clerk, ticket seller, and cashier.[61]   Those jobs are unskilled and performed at the light exertional level, with at least 1,000 jobs in each of those categories available regionally and a few hundred thousand jobs available in each category in the national economy.[62]   Given the additional limitation of having to miss two days of work per month because of seizures, the VE testified that for a few months Plaintiff could maintain employment but consistently missing two days a month would not allow her to keep a job.[63]

## II.   Legal Standards

### A.   Standard of Review

This court's review of a final decision by the Commissioner denying disability benefits is limited to determining (1) whether substantial record evidence supports the decision and (2) whether the ALJ applied proper legal standards in evaluating the evidence. Brown v. Apfel, 192 F.3d 492, 496 (5th Cir. 1999).

If the findings of fact contained in the Commissioner's decision are supported by substantial evidence, they are conclusive, and this court must affirm.   Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990).   Substantial evidence is described as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'"   Greenspan v. Shalala, 38 F.3d 232, 236 (5th

---

[61]   Tr. 35.

[62]   Tr. 35

[63]   Tr. 36.

Cir. 1994) (citing <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971)); it is "more than a mere scintilla, and less than a preponderance." <u>Spellman v. Shalala</u>, 1 F.3d 357, 360 (5th Cir. 1993).  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. <u>Johnson v. Bowen</u>, 864 F.2d 340, 343-44 (5th Cir. 1988).  Under this standard, the court must review the entire record but may not reweigh the record evidence, determine the issues de novo, or substitute its judgment for that of the Commissioner.  <u>Brown</u>, 192 F.3d at 496.

**B.   Standard to Determine Disability**

To obtain disability benefits, a claimant bears the ultimate burden of proving she is disabled within the meaning of the Act. <u>Wren v. Sullivan</u>, 925 F.2d 123, 125 (5th Cir. 1991).  Specifically, under the legal standard for determining disability, the claimant must prove she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can expect to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(a); <u>see also</u> <u>Greenspan</u>, 38 F.3d at 236.  The existence of such disability must be demonstrated by "medically acceptable clinical and laboratory diagnostic findings."  42 U.S.C. §§ 423(d)(3), (d)(5); <u>see also</u> <u>Jones v. Heckler</u>, 702 F.2d 616, 620 (5th Cir. 1983).

To determine whether a claimant is disabled under this standard, Social Security Act regulations ("regulations") provide

that a disability claim should be evaluated according to a sequential five-step process:

> (1) An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.
>
> (2) An individual who does not have a "severe impairment" will not be found to be disabled.
>
> (3) An individual who meets or equals an impairment listed in the regulations ("Listing")[64] will be considered disabled without the consideration of vocational factors.
>
> (4) If an individual is capable of performing the work he has done in the past, a finding of "not disabled" will be made.
>
> (5) If an individual's impairment precludes her from performing her past work, other factors including age, education, past work experience, and residual functional capacity ("RFC") must be considered to determine if other work can be performed.

Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994); see also 20 C.F.R. § 404.1520.  The claimant bears the burden of proof on the first four steps of the inquiry, while the Commissioner bears it on the fifth.  Crowley v. Apfel, 197 F.3d 194, 198 (5th Cir. 1999); Brown, 192 F.3d at 498.  The Commissioner can satisfy this burden either by reliance on the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence.  Fraga v. Bowen, 810 F.2d 1296, 1304 (5th Cir. 1987).  If the Commissioner satisfies his step-five burden of proof, the burden shifts back to the claimant to prove she cannot perform the work suggested.  Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

---

[64]     "Listing" refers to impairments listed in Appendix 1 of the Act's regulations.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

The analysis stops at any point in the process upon a conclusive finding that the claimant is disabled or not disabled.  <u>Greenspan</u>, 38 F.3d at 236.

### III.   <u>Analysis</u>

#### A.   <u>The ALJ's Decision</u>

In his formal decision, the ALJ first noted that Plaintiff had met the disability insured status requirement of the Act from the alleged onset date of disability through March 31, 2011.[65]  The ALJ then followed the five-step process outlined in the regulations, finding at the first step that Plaintiff had not engaged in substantial gainful activity since October 10, 2007, the alleged onset date.[66]  At step two, the ALJ found that Plaintiff suffered from two severe impairments: (1) obesity and (2) seizure disorder.[67]  However, at step three, the ALJ concluded that neither of her impairments were sufficiently severe to meet or medically equal any of the Listings and, therefore, that she was not presumptively disabled under the Act.[68]

The ALJ then took into consideration the information contained in Plaintiff's medical records, as well as the testimony presented at the hearing, and concluded at step four that Plaintiff retained an RFC to perform a full range of work at all exertional levels but with several nonexertional limitations, namely: (1) no work at

---

[65]    Tr. 18.

[66]    Tr. 18.

[67]    Tr. 18.

[68]    Tr. 19.

unprotected heights; (2) no work around dangerous or moving machinery; and (3) no work as a solo caretaker.[69] Specifically, the ALJ determined that Plaintiff was capable of performing her past relevant work as a certified nurse's assistant in a hospital setting, a job performed at the medium, semi-skilled level.[70]

Although the ALJ determined that Plaintiff could perform her past relevant work and was thus not disabled, he also evaluated her in the alternative under step five.[71] Considering her age, education, work experience, and RFC, the ALJ found that Plaintiff could perform jobs, such as an office worker or a ticket seller, that existed in significant numbers in the national economy.[72]

Accordingly, the ALJ found Plaintiff "not disabled" and denied her claim for disability and disability insurance benefits under Title II and Title XVI of the Act.[73]

B.   **Summary of Parties' Arguments**

Plaintiff requests judicial review of the ALJ's decision to deny disability benefits.  In this motion for summary judgment, Plaintiff argues that the administrative decision contains an error of law and that the administrative decision is unsupported by substantial evidence.  Plaintiff specifically argues that the AC

---

[69]    Tr. 19.

[70]    Tr. 20-21.

[71]    Tr. 21.

[72]    Tr. 21.

[73]    Tr. 22.

failed to properly consider new and material evidence that related to the period on or before the date of the ALJ's decision, i.e. Pollock's November 2008 evaluation.

Defendant, on the other hand, contends that the ALJ employed proper legal standards in reviewing the evidence and that the ALJ's decision is supported by substantial evidence of record, including Pollock's report.   Defendant therefore maintains that the ALJ's decision should stand.

**C.   The AC Properly Considered the New Evidence as a Matter of Law**

The AC received Pollock's neuropsychological evaluation, which had taken place after the ALJ issued his decision, as part of the evidence presented for its consideration of whether Plaintiff's case should be reviewed.[74]   In denying Plaintiff's request for review, the AC stated that the "new and material evidence and the decision is [not] contrary to the weight of all the evidence now in the record."[75]   The AC did not, however, provide specific analysis of the relevance of Pollock's report.[76]

The AC is required to consider new and material evidence which relates to the period on or before the date of the ALJ's decision. 20 C.F.R. § 404.970(b).[77]   The requirement of a detailed discussion

---

[74]     Tr. 4.

[75]     Tr. 1.

[76]     See Tr. 1-5.

[77]     This section reads, in full:

If new and material evidence is submitted, the [AC] shall consider the additional evidence only where it relates to the period on or before the date of the [ALJ] hearing decision.   The [AC] shall

of additional evidence by the AC, however, was suspended by a memorandum from the Executive Director of Appellate Operations on July 20, 1995. <u>See</u> <u>Higginbotham v. Barnhart</u>, 405 F.3d 332, 335 n.1 (5th Cir. 2005); Hearings, Appeals, & Litigation Law Manual, § I-3-5-90, 2001 WL 34096367.[78]   Accordingly, the AC did not err as a matter of law by failing to provided detailed analysis of its consideration of Pollock's report.

**D.   <u>Substantial Evidence Supports the ALJ's Decision at Step Four</u>**

Plaintiff next contends that the ALJ's decision is in error because he did not consider Pollock's report, which was not before him at the time of the hearing but was submitted as evidence to the AC when it considered Plaintiff's request for review.   Plaintiff points specifically to Pollock's diagnosis of "cognitive disorder" in arguing that the VE's testimony and the ALJ's decision were based on an incomplete accounting of Plaintiff's ailments.

Pollock reported that Plaintiff had cognitive deficits in the areas of memory and executive functioning.[79]   The results of her neuropsychological evaluation revealed "significant neurocognitive impairments" in language functioning (making it difficult for her to come up with the correct words), visual functioning (making it

---

evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the [ALJ] hearing decision.   It will then review the case if it finds that the [ALJ]'s action, findings, or conclusion is contrary to the weight of the evidence currently of record.

20 C.F.R. § 404.970(b).

[78]   This manual contains program instructions for ALJ's and the AC.

[79]   Tr. 233.

difficult for her to correctly perceive and reproduce visual figures and designs), motor functioning (making it difficult for her to perform motor tasks requiring visual motor integration), memory (making it difficult for her to learn new material and remember conversations and causing her to lose things around the house and to get lost in familiar places), and executive functioning (causing her problems with speed and flexibility of thinking, multitasking, planning, organization, and problem solving).[80]  Pollock concluded that Plaintiff would benefit from cognitive rehabilitation to help remediate her cognitive dysfunction and to help her learn compensatory mechanisms.[81]

Although Plaintiff presents evidence that seizures can inflict cognitive impairment upon the sufferer,[82] the court finds nothing in the record that connects her seizures to the cognitive impairments listed in Pollock's report.  The mere mention of a condition in the medical records does not establish a disabling impairment or even a significant impact on that person's functional capacity.  See Hames v. Harper, 707 F.2d 162, 165 (5th Cir. 1983) (stating that the claimant must show she is so functionally impaired by the impairment that she is precluded from engaging in any substantial gainful activity).  The AC considered Pollock's report and found no reason

---

[80]   Tr. 233.

[81]   Tr. 233.

[82]   See Plaintiff's Motion for Summary Judgment, Docket Entry No. 19, pp. 4-5 (citing ScienceDaily.com, Epilepsy-induced Brain Cell Damage Prevented in Laboratory, http://www.sciencedaily.com/releases/2007/10/071029172818.htm, Oct. 20, 2007 (last visited Oct. 8, 2009)).

therein to challenge the ALJ's decision.[83]  The court also finds no reason to challenge the ALJ's decision on the basis of a report that does not present evidence suggesting that Plaintiff has additional severe impairments that preclude her from performing work activity.

Accordingly, the ALJ properly relied on the VE's testimony regarding the physical demands of Plaintiff's past relevant work when he concluded that Plaintiff was capable of working as certified nurse's assistant.  See, e.g., Sanchez v. Astrue, 265 Fed. Appx. 359, 361 (5th Cir. 2008) (unpublished) (relying on testimony of a VE in finding that claimant was capable of performing his past relevant work).  Consequently, Plaintiff's argument is rejected.

**E.  Defendant's Motion for Summary Judgment**

Defendant asserts in his motion that the ALJ's decision should be affirmed because the ALJ properly determined Plaintiff was never under a disability.

The court recognizes the seriousness of Plaintiff's medical conditions.  However, the court must review the record with an eye toward determining only whether the ALJ's decision is supported by more than a scintilla, but less than a preponderance of evidence.  See Carey, 230 F.3d at 135.  The court finds more than a scintilla of evidence in support of the ALJ's decision.  Therefore, the court cannot overturn the decision of the ALJ, who is given the task of weighing the evidence and deciding disputes.  See Chambliss, 269

---

[83]    Tr. 1.

F.3d 520, 522 (5th Cir. 2001).

For the reasons stated above, the court finds Defendant satisfied his burden.  As a result, the ALJ's decision finding Plaintiff not disabled is supported by substantial record evidence. The court also agrees with Defendant that the AC did not err as a matter of law in evaluating the evidence and in making its determination.  Defendant's motion for summary judgment is granted.

## IV.   <u>Conclusion</u>

Based on the foregoing, the court **GRANTS** Defendant's Cross Motion for Summary Judgment and **DENIES** Plaintiff's Motion for Summary Judgment.

**SIGNED** in Houston, Texas, this 13th day of October, 2009.

Nancy K. Johnson
United States Magistrate Judge